UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MUHAMMAD KHABIYR ) | CASE NO.  1:15CV217 |
| ) | |
| Plaintiff ) | MAGISTRATE JUDGE |
| ) | GEORGE J. LIMBERT |
| v. ) | |
| ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLVIN, ) | |
| ACTING COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION ) | |
| ) | |
| ) | |
| Defendant. ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Muhammad Khabiyr Supplemental Security Income (SSI).  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in her October 17, 2013 decision in finding that Plaintiff was not disabled because he could perform a significant number of light jobs that exist in the national economy (Tr. 9-18).  The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

**I.**     **PROCEDURAL HISTORY**

Plaintiff, as the ALJ noted in her decision, has submitted multiple applications for Supplemental Security Income (SSI) (Tr. 9).  Prior to the application under consideration here, Plaintiff received an unfavorable decision on March 16, 2011 (Tr. 9).  He filed his current application

1

on August 30, 2012 (Tr. 147-152). He alleged a disability onset date of August 23, 2012 (Tr. 147). The agency denied his application initially (Tr. 77, 78-87, 101-103), and on reconsideration (Tr. 89-100, 107-109, 110-111, 112-114). Plaintiff requested a hearing (Tr. 115-117), and, on September 11, 2013, he appeared before Administrative Law Judge Patricia Loesel (Tr. 23-42). Mark Anderson testified as a vocational expert (Tr. 42-49). On October 17, 2013, ALJ Loesel found Plaintiff not disabled because he could perform a significant number of light jobs (Tr. 9-18). When the Appeals Council declined review on December 19, 2014, the ALJ's decision became the Commissioner's final decision in this case. Plaintiff has requested judicial review pursuant to 42 U.S.C. Section 1383(c).

## II.  STATEMENT OF FACTS

Plaintiff was born on October 28, 1964, and was forty-eight years old at the time of the hearing (Tr. 147). Plaintiff may have graduated from high school, and has past relevant work experience as a material handler, which was rated as medium and low-level semi-skilled work (Tr. 43, 177).

## III.  SUMMARY OF MEDICAL EVIDENCE

In his brief, Plaintiff refers to a consultative exam done by David V. House, Ph.D., psychologist, on April 22, 2009 (Tr. 231-235). That report's version of the facts differs from some statements in Plaintiff's brief. For example, the brief states that Plaintiff is a high school graduate (Plaintiff's Brief at 3). Dr. House described Plaintiff as a poor historian, and stated that he advanced as far as the tenth grade in school with fair grades (Tr. 232). Dr. House's report stated that, initially, Plaintiff was incarcerated for eighteen years at Mansfield, and that the incarceration ended in 2002 (Tr. 232). Then, Plaintiff served time for felonious assault from 2006 until 2008 (Tr. 232). Dr. House

noted that Plaintiff was a registered sex offender (Tr. 232). Plaintiff told Dr. House that his life had changed, as he had spent approximately the last twenty-five years of it in prison (Tr. 234).

A note dated February 17, 2012, and attributed to Referring Therapist/Intern Sarah May, noted that Plaintiff was seen at Connections in December 2011 and at the Free Clinic for an intake on January 30, 2011 (Tr. 500). Ms. May stated that Plaintiff was taking Remeron and Abilify, and that he responded well to these medications (Tr. 500). Ms. May noted a history of violence with a conviction for assault in 1985, and a jail term for Plaintiff that lasted until 2002 (Tr. 500). Plaintiff reported another conviction for an assault charge in 2006 that resulted in his serving another two years in prison (Tr. 500). Ms. May stated that further evaluation was needed to determine whether Plaintiff had a Bipolar Disorder (Tr. 500).

A Transfer/Discharge Summary electronically signed by Kristen Dietrich, QMHS on August 24, 2012, and by someone (signature illegible) with a Ph.D. on September 5, 2012, indicated that Plaintiff entered the program on February 13, 2012 and had a last contact with the program on March 13, 2012 (Tr. 512). The program discharged Plaintiff because he did not return for services after his admission in February (Tr. 512). This report stated that CSP (presumably Connections) only met client once, but it also stated that Plaintiff had been stable on his medications and had not been in the hospital (Tr. 513).

A form signed by Lysette Ramos, M.D. at the Free Clinic of Greater Cleveland identified a date first seen as February 22, 2012, and a date last seen as January 2, 2013 (Tr. 566). Plaintiff had an Initial Psychiatric Evaluation on February 22, 2012 (Tr. 551-553). This report repeated the history of Plaintiff's incarcerations, and noted that he was trying to re-qualify for SSI, as he had previously received benefits (Tr. 552). This unsigned report listed a diagnosis of bipolar disorder with psychosocial stressors identified as past incarcerations, limited supports, and no income (Tr. 553).

3

The author assigned a Global Assessment of Functioning (GAF) rating of 50 (Tr. 553).

A treatment note from March 21, 2012, signed by Dr. Ramos, included Plaintiff's statement that things were "good," and that he was doing well on medications and was not too sedated (Tr. 549). The note also indicated that Plaintiff was eating well and had no agitated episodes (Tr. 549). On May 30, 2012, Plaintiff reported that things were going well (Tr. 547). Plaintiff said he spent his days taking walks, and he denied concerns or complaints (Tr. 547). On July 18, 2012, Plaintiff reported that he spent most days walking and getting fresh air (Tr. 545). He was not feeling depressed, and reported that energy, sleep, and appetite were good (Tr. 545). Plaintiff said he had a support system consisting of his brotherhood at the Mosque he attended on Fridays (Tr. 545).

On September 12, 2012, Plaintiff reported that he was "sad and mad" because SSA had turned down his disability appeal (Tr. 543). He reported that he had re-submitted his appeal, and that he was looking for a new lawyer (Tr. 543). Plaintiff denied thoughts of harm towards anyone, but also reported that he still feared being in groups because others could make him angry (Tr. 543). Plaintiff denied medication side effects (Tr. 543). On November 28, 2012, Plaintiff reported that his energy and appetite were good (Tr. 540).

On October 23, 2012, Aracelis Rivera, Psy. D. reviewed the record and opined that Plaintiff had a medically-determinable mental impairment that did not precisely satisfy the diagnostic criteria of Listing 12.04 (Affective Disorders) (Tr. 82). Dr. Rivera opined that Plaintiff was best suited for a static work environment. She recommended that if changes in routine became necessary, those changes should be explained easily to Plaintiff (Tr. 84). Dr. Rivera ultimately determined that Plaintiff was not disabled (Tr. 86).

On December 28, 2012, state agency reviewing psychologist Mary K. Hill, Ph.D. reviewed updated records and found no reports of acute psychiatric changes for Plaintiff (Tr. 98). Dr. Hill

4

noted that, despite a blunted affect, Plaintiff was otherwise cooperative, and that he reported good coping skills for stress (Tr. 98).

A treatment note dated January 2, 2013 recommended that Plaintiff continue his current medications (Remeron and Abilify) (Tr. 570). The note also reported that the holidays went well (Tr. 569).

On February 6, 2013, Dr. Ramos filled out a Medical Source Statement of Patient's Mental Capacity (Tr. 571-572). The subsequent record contained notes, indicating that Plaintiff continued treatment at the Free Clinic, and that he was seen on February 6, 2013 (Tr. 578-579), March 6, 2013 (Tr. 576-577), and May 22, 2013 (Tr. 573-574).

## IV. **SUMMARY OF TESTIMONY**

Plaintiff testified that he had lived with his mother since he got out of jail in 2008 (Tr. 30). He said that he helped out at home by doing the dishes (sometimes), sweeping and cleaning up, and helping his mother move things when so needed (Tr. 30). Plaintiff testified that his mother did the cooking and the laundry (Tr. 30). He sometimes went along with his sister and mother to do grocery shopping (Tr. 31). Plaintiff had not driven a car since 2008, and testified that when he needed to get somewhere, he went on the bus (Tr. 31). He took a bus to the hearing (Tr. 31).

On a typical day, Plaintiff would wake up, eat breakfast, watch television, and sometimes walk a short distance and return home (Tr. 31). When asked if he belonged to any organizations, Plaintiff responded that he went to his mosque, but just on Fridays (Tr. 32). Plaintiff testified that he attended school through twelfth grade (Tr. 32). Plaintiff said he last worked in 2006 (Tr. 34).

He had worked for Gregg Appliances, but left when he was arrested for theft (Tr. 35). He noted that he had previously received benefits, and that the benefits stopped when he was incarcerated

(Tr. 36). Plaintiff said he received benefits due to his bipolar disorder and his manic-depressive disorder (Tr. 36). Although he said his doctor told him he had these conditions as a child, he received formal diagnoses in 2000 (Tr. 36). Plaintiff said he took two medications, Remeron and Abilify, for his mental conditions (Tr. 36). He took these medications while incarcerated, and said that they worked quite well (Tr. 37). Specifically, Plaintiff said the medications helped him to focus a little bit better, and they helped him stay out of trouble (Tr. 37). He identified his fear of being around people as his biggest impediment to returning to work (Tr. 42). Plaintiff testified that he was afraid he would end up back in jail if he had to work around other people (Tr. 42).

Thereafter, the vocational expert, Ms. Anderson, identified one significant past job for Plaintiff–his job at Gregg Appliance–where he worked as a material handler (Tr. 43). The vocational expert classified that job as heavy and semi-skilled (Tr. 43). The ALJ asked the vocational expert to consider a person of the same age, education, and work experience as Plaintiff, who could perform medium work, except that he could only occasionally climb ramps and stairs, and occasionally climb ladders, ropes, or scaffolds (Tr. 44). This person could occasionally stoop, kneel, crawl, and crouch (Tr. 44). He could interact superficially with others (have short conversations with a specified purpose, in a static or infrequently changing environment) (Tr. 44). In response, the vocational expert identified jobs that this person could perform, including hand packager, laundry laborer, and assembler of metal products (Tr. 44-45).

The ALJ's second question added a limitation to low-stress work (no arbitration, negotiation, responsibility for others, or supervisory responsibility) (Tr. 45). The vocational expert responded that the person could still perform the three jobs he had already identified (Tr. 45). The ALJ's third question added the limitation of the worker missing work two or three times each month (Tr. 45). The vocational expert replied that an employer would probably tolerate two absences per month, although

an employer would not tolerate three absences each month (Tr. 45). Similarly, the vocational expert testified that a person could not be "off-task" for twenty percent of a working day and maintain employment (Tr. 45-46).

The ALJ then posed an additional hypothetical question that asked about a person of the same age, education, and work experience as Plaintiff, who could occasionally lift thirty pounds, frequently lift twenty pounds, stand for three to four hours, and stand and walk for thirty minutes at a time (Tr. 46). This person could sit for six hours in an eight-hour day (Tr. 46). This person could occasionally climb ramps and stairs, as well as ladders, ropes, or scaffolds (Tr. 46). He could occasionally balance, stoop, and crouch, but could never kneel or crawl (Tr. 46). He could frequently reach and perform fine and gross manipulations (Tr. 46). This person needed to avoid temperature extremes and could interact superficially in a static work environment (Tr. 46). The ALJ defined these terms as he had previously, and added that if changes in the routine were necessary, they should be easily explained (Tr. 46). The ALJ also limited this person to low-stress work, as defined in the previous hypothetical questions (Tr. 47).

The vocational expert replied that this person could perform a light job as an assembler of electrical accessories, as well as light level jobs as an inspector and as a hand packager (Tr. 47). The vocational expert also provided numbers for these jobs that demonstrated that each existed in significant numbers in the local, state, and national economies (Tr. 48). Plaintiff's representative did not pose any questions to the vocational expert (Tr. 48). The vocational expert testified that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* (DOT), but that he had also relied on materials outside the DOT (Tr. 48).

## **V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes

a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## **VII.** **ANALYSIS**

Plaintiff asserts one assignment of error:

WHETHER THE ALJ'S FAILURE TO PROPERLY EVALUATE AND ASSIGN APPROPRIATE WEIGHT TO THE OPINION OF PLAINTIFF'S TREATING PSYCHIATRIST RESULTED IN REVERSIBLE ERRORS IN THE DETERMINATION OF PLAINTIFF'S DISABILITY AT STEPS THREE AND FIVE OF THE SEQUENTIAL ANALYSIS PROCESS.

The treating physician rule requires that ALJs give controlling weight to a treating physician's opinion, rather than favoring the opinions of a non-treating physician, if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other

9

substantial evidence of record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see, also,* 20 C.F.R. 404.1527(d)(2), (f). Exceptions exist, but only if adequately explained. *Wilson*, 378 F.3d at 544. The Sixth Circuit has stated, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non controlling status notwithstanding." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). In other words, even if an ALJ finds that the opinion of a treating source is not entitled to controlling weight, this finding does not mean the opinion should be rejected. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). Rather, if the ALJ declines to place controlling weight on the opinion of the treating source, the ALJ must then continue to weigh it under a number of factors set forth in the Regulations.

In *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (2013), the Sixth Circuit emphasized that if the treating source opinion is not given controlling weight, the ALJ should then determine the appropriate weight based off of 20 C.F.R. Section 404.1527(d)(2) (length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source). Additionally, "[i]n articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician (*Hensley v. Astrue*, 573 F.3d at 206-267 (6th Cir. 2009)) or that objective medical evidence does not support that opinion." *Frend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-552 (6th Cir. 2010). In Plaintiff's case, the ALJ correctly utilized the standards set forth in 20 C.F.R. Section 404.1527(d)(2) and gave good reasons for giving less than controlling weight to Dr. Ramos' opinion.

The ALJ provided "good reasons" for assigning "little weight" to two forms that Dr. Ramos

10

filled out in early 2013. The ALJ determined that the opinions expressed on the form dated January 2, 2013 deserved little weight because statements about markedly-limited social interaction due to isolation and withdrawal conflicted with the GAF rating of 50 assigned by the Free Clinic and with Plaintiff's reports about his activities (Tr. 16). The ALJ emphasized such activities as Plaintiff's involvement with his mosque and his ability to ride on public transportation (Tr. 16).

The ALJ assigned little weight to Dr. Ramos' February 6, 2013 opinion that Plaintiff could only rarely tolerate changes, working around others, work stress, working a normal week, carrying out simple tasks, or relating predictably, because such limitations conflicted with Plaintiff's report of reading the newspaper and playing games with others (Tr. 16).

Plaintiff argues that support for Dr. Ramos' findings can be found in contemporaneous treatment notes that reflect anger and yelling. (Plaintiff's Brief at 9, citing Tr. 574, 578). The note found at Tr. 574 dates from May 22, 2013, and would not have been available to Dr. Ramos when she filled out forms in January and February 2013 (Tr. 574). The other note that Plaintiff cited dated from February 6, 2013 (Tr. 578). While this note is contemporaneous with the February 6, 2013 form that Dr. Ramos filled out, it too was not available to Dr. Ramos when she submitted her January 2, 2013 form (Tr. 566). Plaintiff has emphasized a single episode of yelling. The treatment note dated February 6, 2013 stated that Plaintiff reported one excessive anger episode in the past week that involved yelling (Tr. 578). The reason for this episode was that Plaintiff was frustrated over the process of applying (re-applying) for disability (Tr. 578). These two notes do not support Dr. Ramos' diagnosis (Tr. 574).

Plaintiff indicated that Dr. Ramos had been treating him since February 2012. He does not mention in any detail the treatment notes Dr. Ramos submitted between that date and January-February 2013, when Dr. Ramos filled out the two forms. Those notes do not support the limitations

11

found on Dr. Ramos' forms.  In the treatment note from March 21, 2012, Plaintiff reported that things were "good," and that he was doing well on medications and was not too sedated (Tr. 549).  The note also indicated that Plaintiff was eating well and had no agitated episodes (Tr. 549).  The next treatment note, dated May 30, 2012, also included Plaintiff's statement that things were going well (Tr. 547). Plaintiff said he spent his days taking walks (Tr. 547).  At this visit, Plaintiff denied concerns or complaints (Tr. 547). On July 18, 2012, Plaintiff reported that he spent most days walking and getting fresh air (Tr. 545).  He stated that he was not feeling depressed, and reported having good energy, and that he was sleeping and eating well (Tr. 545).  Although Dr. Ramos had reported a lack of supports as one of her concerns for Plaintiff when she did her evaluation (Tr. 553), during this visit, Plaintiff told Dr. Ramos that he had a support system consisting of his brotherhood at the Mosque (Tr. 545). The treatment notes from the Free Clinic, submitted prior to Dr. Ramos filling out her forms in January and February 2013, undermine the limitations identified on those forms.

Furthermore, the ALJ accommodated Plaintiff's limitations.  Plaintiff argues that both Dr. Hosue and the forms filled out by Dr. Ramos indicated he had marked limitations in concentration, persistence, and pace. (Plaintiff's Brief at 9.)  Actually, the ALJ considered the fact that Plaintiff had moderate difficulties in this area of functioning (Tr. 13).  The ALJ accommodated that concern by limiting Plaintiff to low stress work, in a static environment, where there would only be superficial interactions with others (Tr. 14).

Thus, the ALJ correctly followed the treating physician rule in assigning less weight to Dr. Ramos' opinions, and correctly considered Plaintiff's mental impairments, including his moderate limitations in concentration, persistence, and pace.

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform jobs that exist in significant numbers in the national economy, and, therefore, was not disabled.  Hence, he is not entitled to SSI.


Dated: December 23, 2015                                       */s/George J. Limbert*
                                                               GEORGE J. LIMBERT
                                                               UNITED STATES MAGISTRATE JUDGE